FILED

2025 JAN 10 PM 2: 57

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF
SANTA ANA

BY    MBA

1  **GERALD BAROS**
2  784 Miami St
3  Leavenworth, KS 66048
4  Phone: (816) 491-1927
5  Email: barosgerald@gmail.com
6  In pro se
7
8
9
10
11  **UNITED STATES DISTRICT COURT**
12  **CENTRAL DISTRICT COURT OF CALIFORNIA**
13
14  **GERALD BAROS**,                          Case No.: Number
15                                                8:25-cv-00047-JWH (ADSx)
          Plaintiff,
16
    vs.
17  **CREDICO USA, LLC, MATTHEW J.**       **COMPLAINT PURSUANT TO 18**
18  **KELLY**, in his official and individual   **U.S.C. § 1964 (RICO) AND**
    capacities, **MELA GROUP, INC.,**        **CALIFORNIA UNFAIR**
19  **MICHAEL J. FLYNT, LLC,**               **COMPETITION LAW (BUSINESS**
20  **MICHAEL J. FLYNT**, in his official     **AND PROFESSIONAL CODE**
    and individual capacities, **ANDES CC**  **SECTION 17200)**
21  **GROUP, INC., JOSE CORRAL**, in his
22  official and individual capacities, **A**
    **GAME CONSULTING, INC.,**
23  **BRUNO SKRZECZKOWSKI**, in his
24  official and individual capacities,
    **CONNOR HOLZ,** in his official and
25  individual capacities, **LUCIA**
26  **CATALAN,** in her official and
    individual capacities, **RAVEN**
27  **MCBRIDE,** in her official and
    individual capacities, **JOSE**
28  **GONZALEZ,** in his official and
    individual capacities, **ROBERT CRUZ,**
    in his official and individual capacities,
    **GREGORY CLEMONS,** in his official

[1]

and individual capacities, **ANDY RAMOS,** in his official and individual capacities,

Defendants.

## I.   INTRODUCTION

1. **This Complaint is brought by the Plaintiff to seek redress and justice for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) pursuant to 18 U.S.C. § 1964 and the California Unfair Competition Law (Business and Professional Code Section 17200). The Plaintiff alleges that the Defendants—CREDICO USA, LLC, MATTHEW J. KELLY, MELA GROUP, INC., MICHAEL J. FLYNT, LLC, MICHAEL J. FLYNT, ANDES CC GROUP, INC., JOSE CORRAL, A GAME CONSULTING, INC., and BRUNO SKRZECZKOWSKI engaged in a pattern of racketeering activities and unfair business practices that caused significant harm to the Plaintiff and the public at large. The Plaintiff seeks remedy.**

## II.   JURISDICTION AND VENUE

1. **Federal Question Jurisdiction:**
   **This Court has jurisdiction over the claims asserted under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c), pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States.**

2. **Diversity Jurisdiction:**
   **This Court also has jurisdiction over the state law claim under California Business and Professions Code § 17200 pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs. The Plaintiff, GERALD BAROS, is a citizen of KANSAS, and the Defendant(s), Credico USA, LLC, Matthew J. Kelly, MELA Group, Inc., Michael J. Flynt, LLC, Michael J. Flynt, Andes CC Group, Inc., Jose Corral, A Game Consulting, Inc., and Bruno Skrzeczkowski., are citizens of CALIFORNIA and DELAWARE.**

[2]

3. **Supplemental Jurisdiction:**
This Court has supplemental jurisdiction over the state law claim under California Business and Professions Code § 17200 pursuant to 28 U.S.C. § 1367 because the state law claim forms part of the same case or controversy as the federal RICO claim, arising from the same set of facts and conduct of the Defendant(s).

4. **Venue:**
Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) because Credico USA, LLC, Matthew J. Kelly, MELA Group, Inc., Michael J. Flynt, LLC, Michael J. Flynt, Andes CC Group, Inc., Jose Corral, A Game Consulting, Inc., and Bruno Skrzeczkowski resides, is/are found, has/have an agent, or transact(s) affairs in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

5. **Nationwide Service of Process:**
This Court has authority under 18 U.S.C. § 1965(b) to summon parties residing in other districts to this Court because the ends of justice require that all defendants be brought before this Court to adjudicate the claims in this action.

## III.   PARTIES

1.      Plaintiff, GERALD BAROS, is an individual residing at 784 Miami St, Leavenworth, Kansas 66048 and the primary party of this action.

2.      Defendant, CREDICO USA, LLC, is a Delaware Corporation. Registered Agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Headquarters: 550 W Van Buren St, Suite 1100, Chicago, Illinois 60607 and in operation of business in California.

3.      Defendant, MATTHEW J. KELLY, individually and officially. Defendant is a California resident residing at 7001 Weldon Ave, Bakersfield, CA 93308 and officially an agent of CREDICO USA, LLC.  Email: matthewjkelly72@gmail.com.

[3]

4.    Defendant, MELA GROUP, INC., is a California corporation and a primary defendant in this action. Registered Agent is Michael Flynt 1051 E Wardlow Rd, Long Beach, California 90807 and in operation of business in California.

5.    Defendant, MICHAEL J. FLYNT, LLC, is a California corporation and a primary defendant in this action. Registered Agent: Michael Flynt, 1051 E Wardlow Rd, Long Beach, California 90807 and in operation of business in California.

6.    Defendant, MICHAEL J. FLYNT, individually and officially. Defendant is a California resident residing at an unknown residence. Email: mikesmelagroup@gmail.com. Agent of MELA GROUP, INC., MICHAEL J. FLYNT, LLC., and in operation in California and serviceable through MELA GROUP, INC. 1051 E Wardlow Rd, Long Beach, California 90807.

7.    Defendant, ANDES CC GROUP, INC., is a California corporation and primary defendant in this action. Registered Agent: Jose Corral, 1240 S State College Blvd, Suite 135, Anaheim, California 92806 and in operation of business in California.

8.    Defendant, JOSE CORRAL, individually and officially. Defendant is a resident of California residing at 2140 Hoover Ave, Unit 321, National City, CA 91950. Email: jcorral90@gmail.com, jose@andesgroupinc.com. An agent of ANDES CC GROUP, INC and doing business in California. Serviceable through ANDES CC GROUP, INC. at 1240 S State College Blvd, Suite 135, Anaheim, California 92806.

9.    Defendant, A GAME CONSULTING, INC., is a California corporation and a primary defendant in this case. Registered Agent: Bruno Skrzeczkowski, 1240 S State College Blvd, Suite 135, Anaheim, California 92806 and doing business in California.

10.    Defendant, BRUNO SKRZECZKOWSKI, individually and officially. Defendant is a California resident residing at 1328 Cota Ave, Torrance, CA 90501. Agent of A GAME CONSULTING, INC and serviceable at 1240 S State College Blvd, Suite 135, Anaheim, California 92806 and doing business in California.

[4]

11.     Defendant, CONNOR HOLZ, individually and officially. Defendant is a California resident residing at 533 W Summerfield Cir., Anaheim, CA 92802. Defendant was an employee and agent for MELA GROUP, INC. and ANDES CC GROUP.

12.     Defendant, LUCIA CATALAN, individually and officially. Defendant is a California resident residing at 3600 Norton Ave, Unit V, Lynwood, CA 90262. Defendant was an employee and agent for MELA GROUP, INC. and ANDES CC GROUP.

13.     Defendant, RAVEN MCBRIDE, individually and officially. Defendant is a California resident residing at 8711 S Harvard Blvd, Unit 337, Los Angeles, CA 90047. Defendant was an employee and agent for MELA GROUP, INC. and ANDES CC GROUP.

14.     Defendant, JOSE GONZALEZ, individually and officially. Defendant is a California resident residing at an unknown residence. Defendant was an employee and agent for MELA GROUP, INC. and ANDES CC GROUP and can possibly be served at 1240 S State College Blvd, Suite 135, Anaheim, California 92806, his last known employment.

15.     Defendant, ROBERT CRUZ, individually and officially. Defendant is a California resident residing at an unknown residence. Defendant was an employee and agent for MELA GROUP, INC. and ANDES CC GROUP and can possibly be served at 1240 S State College Blvd, Suite 135, Anaheim, California 92806, his last known employment.

16.     Defendant, GREGORY CLEMONS, individually and officially. Defendant is a California resident residing at an unknown residence. Defendant was an employee and agent for MELA GROUP, INC. and ANDES CC GROUP, INC. and can possibly be served at 1240 S State College Blvd, Suite 135, Anaheim, California 92806, his last known employment.

17.     Defendant, ANDY RAMOS, individually and officially. Defendant is a California resident residing at an unknown residence. Defendant was an employee and agent for MELA GROUP, INC. and ANDES CC GROUP, INC.

[5]

and can possibly be served at 1240 S State College Blvd, Suite 135, Anaheim, California 92806, his last known employment.

## IV.   STATEMENT OF FACTS

1.      In January of 2020 I entered into employment with TRI-CORE MANAGEMENT, INC., also called or doing business as Encompass Core (ENCOMPASS CORE).

2.      ENCOMPASS CORE is a multilevel marketing business and independent corporate distributor under the umbrella of CREDICO USA, LLC (CREDICO), a Delaware company headquartered in Illinois.

3.      I took employment into an apparent 4 phase "Management Training Program" (MTP).

4.      The 4 phases of the MTP, in order, are Brand Ambassador, Account Director, Assistant Manager, and Director.

5.      First, the Brand Ambassador phase is essentially structured as a 2–4-week phase that teaches or consist of basic communication, marketing sales strategy and techniques, product knowledge, self-management, compliance, and a production quota.

6.      Secondly, the Account Director phase is essentially structured as a 3-7-month phase that teaches or consist of conducting interviews, office responsibilities, logistics, team management, employee development, and a production quota.

7.      Thirdly, Assistant Manager phase is essentially structured as a 2-4-month phase that teaches or consist of office operations and responsibilities, human resources, payroll, and has no production quota.

8.      Lastly, the Director phase is essentially structured to consist of market control, severance with a fraction of your team, and ultimately results in the assisted formation of a corporation and placement into a geographic market.

9.      Each phase is compensated with a commission or day-rate and/or an override from the managed team's production.

10.     The MTP is used universally across campaigns with clients and campaign like SPRINT, TMOBILE, AT&T, and among others.

11.     Also, the Director takes an override percentage from the Directors produced from their MTP.

12.     Further, once a Director produces approximately 5 Directors he is structurally considered a Regional Manager, and his or her override percentage is increased.

[6]

13.    Next, when he produces approximately 10 Directors he is structurally considered a National Manager, and his or her override percentage is increased.

14.    Ultimately, the Director would structurally be produced into partnership with the umbrella company.

15.    The marketing campaign I was recruited into was to distribute for ASSURANCE WIRELESS (ASSURANCE), a subsidiary of SPRINT and subsequently purchased by TMOBILE.

16.    Specifically, ASSURANCE provides enrollment into the federally funded Life Line program that provides free telephones and services to low-income households.

17.    The campaign conducted face-to-face enrollment of qualified individuals at various kiosk locations in Orange County, California.

18.    The Kiosk were essentially consistent of a foldable table, canopy tent, marketing material, and federally regulated materials, and operations.

19.    Tablets were used to enroll individuals through an application process that required the submission of sensitive information, through various forms of documentation, to substantiate identity, address, and income.

20.    Further, when the process was completed successfully, we were entrusted to activate a cellphone with service and internet and lawfully complete the process by giving it to the consumer.

21.    Commissions were based off the performance and quantity of this customer acquisition.

22.    The quantity of applications are 5 phones to earn a day rate or get paid.

23.    I managed numerous teams and had cultivated the Orange County market from the inception of my employment.

24.    Between August and September of 2020 ENCOMPASS CORE took on a new campaign for AT&T in residential sales.

25.    ENCOMPASS CORE took approximately 5 members of my downline to train for AT&T and left me approximately 5 others to remain on the ASSURANCE campaign.

26.    During this time, I acted in nearly all capacities of the company's management operation for ASSURANCE.

27.    Management nevertheless decided to transfer the entire operation to the AT&T campaign.

28.    In November 2020 however I was given credential for the ASSURANCE WIRELESS marketing campaign and given full management capacity.

[7]

29.    Also, in November 2020 MICHAEL J. FLYNT expanded an office or business into the Orange County market.

30.    The expansion was the promotion and launch of ANDES CC GROUP, INC.

31.    ANDES CC GROUP, INC. is a California corporation owned and operated by JOSE CORRAL.

32.    Further, ANDES CC GROUP, INC. is a business and market under the regional management or national management of MICHAEL J. FLYNT, MELA GROUP, INC., and MICHAEL J. FLYNT, LLC.

33.    Now, the marketing firm I was at became in competition or conflict for the same geographic market, Orange County.

34.    The kiosk locations in Orange County had been managed and operated by ENCOPASS CORE for the years preceding the launch of ANDES CC GROUP, INC.

35.    The marketing team under the ANDES CC GROUP launch into Orange County was initially employed by MELA GROUP, INC. and later transferred their employment to ANDES CC GROUP, INC.

36.    I began to see numerous employees of MELA GROUP, INC. AND ANDES CC GROUP, INC. at numerous kiosk location in the Orange County market and at various times.

37.    Next, on January 12, 2021 I worked a kiosk cite at the intersection of State College Blvd and Lincoln Ave in Anaheim, CA.

38.    Here, employee Lucia Catalan was also attempting to work the same location.

39.    Lucia Catalan made a phone call to her management.

40.    Lucia Catalan began demanding I leave the location and I declined.

41.    I essentially continued to work as normal.

42.    I believe that my production of clients that day was significantly more productive than Lucia Catalan and this fact offended Lucia Catalan.

43.    Lucia Catalan threatened me and said "just wait and see".

44.    Eventually JOSE CORRAL arrived at the location and demanded I leave and told me I couldn't be there.

45.    After I concluded the production of 5 clients for Assurance Wireless I departed to my home, at the time, in Corona, CA.

46.    On January 13, 2021 I conducted my work in Santa Ana, CA.

47.    On January 14, 2021 I returned to work my kiosk cite at the intersection of State College Blvd and Lincoln Ave in Anaheim, CA.

[8]

48.   Then and there, I learned from my clients and colleague that
MICHAEL J. FLYNT had gathered a violent mob of assailants and went to
State College Blvd, and Lincoln Ave in Anaheim, CA to retaliate against me
on January 13, 2021.

49.   This violent attempt to harm me I believed to be a reckless act that
could have had fatal results and I became very concerned for my safety and
life.

50.   I became disturbed by the violent attempt of MICHAEL J. FLYNT and
decided to switch my locations so I couldn't be harmed.

51.   Next, on January 15, 2021 I worked on E Orangethorpe Ave and N
Lemon St in Anaheim, CA.

52.   I painstakingly began to acquire customers for Assurance Wireless
because an agent CONNOR HOLZ of MELA GROUP, INC. and ANDES CC
GROUP, INC. began inciting customers and competitors against me

53.   They claimed I was an unauthorized agent and it was illegal for me to
be working, the phones I give out will not work consequently, and I needed to
leave.

54.   Next, CONNOR HOLZ began yelling obscenities at me.

55.   When I came closer to CONNOR HOLZ, he stated twice that "they had
my work address and my house address" and I was going to "get handled".

56.   Gradually nearly every member of the MELA GROUP, INC. AND
ANDES CC GROUP, INC. enterprise that I encountered at my locations
would be belligerent, often made threats, became hard to work near and
would demand my spot in threats of violence.

57.   Further, on Febuary 4, 2021 I worked at State College Blvd and Lincoln
Ave in Anaheim, CA.

58.   Then and there I was approached by BRUNO SKRZECZKOWSKI and
told that if spoke to his clients I would be "hurt".

59.   Later he rephrased his threat and said that if I spoke to his people it
"was going down".

60.   I again felt extremely overwhelmed by violence and threats in my
everyday task of acquiring customers for Assurance Wireless.

61.   In addition to being threatened for my locations frequently I began to
notice on a bases that agents of their enterprise were conducting a fraud
scheme.

62.   Particularly, on Febuary 8, 2021 I worked at State College Blvd and
Lincoln in Anaheim, CA.

[9]

63. I previously observed agents of this enterprise sell numerous fraudulent phones and service accounts.

64. Then and there, I noticed LUCIA CATALAN and her trainee RAVEN MCBRIDE sell several phones fraudulently.

65. I yelled out that they could get into trouble for that.

66. LUCIA CATALAN responded that she couldn't get caught because they use "old codes".

67. Each Assurance Wireless agent has login credentials that link them to their applications and production.

68. They were processing fraudulent application through old codes, activating the phones, and selling them.

69. The efforts of their fraudulent scheme were so blatant that agents from their enterprise would be issued fraudulently activated phones to sell.

70. Next, I departed from the location and picked up my wife.

71. I felt that their enterprise was out of control and should be held accountable.

72. I sent someone with $20 to approach the LUCIA CATALAN AND RAVEN MCBRIDE at their kiosk.

73. The person I sent asked if she could buy a "burner phone" because she doesn't qualify.

74. RAVEN MCBRIDE clarified the terms of the transaction with her leader LUCIA CATALAN and then sold the phone for $20.

75. This interaction was recorded to avoid skepticism.

76. The phone, charger cable, and charger box were packaged in a zip lock bag and labeled 2/6.

77. The phone was activated on January 8, 2021 under the identity of RICHARDS L GOMEZ.

78. I reported my investigation to my owner but he chose to wait for a better time.

79. On Febuary 23, 2021 when I was arriving at my company's office, I was approached by 2 men dressed in hoods.

80. Then and there, they told me MICHAEL FLYNT says to get a new job and shockingly punched the side of my head.

81. I heard someone say to give up my wallet.

82. I ran as fast as I could into the building and proceeded to the office at the third floor.

83. While at the third floor I noticed a silver car pick up the perpetrators but was unable to get the license plates.

[10]

84.     Because it was my younger son's birth on Febuary 23, 2021 I decided not to call the police immediately and instead hosted my son's birthday party.

85.     Next, on Febuary 24, 2021 I took a picture of an activated phone that was being solicited by CONNOR HOLZ on State college Blvd and Lincoln Ave in Anaheim, CA.

86.     The box was marked with a number and pin and ready to be sold.

87.     Also, in March of 2021 I was assaulted by an individual at the Fullerton train station, a kiosk location.

88.     The individual then took my tent that I gained some distance from and I left to avoid any further altercation.

89.     Next, on March 26, 2021 at W Ball and Brookhurst St in Anaheim, CA I was approached threateningly by GREGORY CLEMONS an agent for the MELA GROUP, INC. AND ANDES CC GROUP, INC. enterprise.

90.     He first demanded I leave the spot in exchange of being spared violence and also asked if I wanted MICHAEL FLYNT to come pay me a visit.

91.     He made a phone call to his management team at ANDESS CC GROUP, inc. and asked if I was the "Jerry" that EVAN APARICIO assaulted, apparently referencing my assault and robbery at the Fullerton train station earlier in March.

92.     My locations became commonplace for harassment and despicable behavior towards my simple presence.

93.      Also, on April 28, 2021 at State College and Lincoln ANDY RAMOS refused to allow me to work and sabotaged my day.

94.     He would pester my clients from me and literally push me with his shoulders when he passed by, clearly provoking me into a violent interaction with him.

95.     Further, on May 18, 2021 at State College Blvd and Lincoln Ave in Anaheim, CA I worked besides CONNER HOLZ again.

96.     Then and there, CONNOR HOLZ switched the address on an envelope to make his envelope fraudulently appear as if it came from the address he wanted and not the address it was legally mailed to.

97.     Further, on June 2, 2021 at Beach Blvd and Lincoln Ave in Anaheim, CA agent JOSE GONZALEZ began demanding I move my car and leave.

98.     Further, he threatened that if I didn't give up my location I would be hurt.

99.     He began to pounce on me as if to assault me but I took out my phone and recorded him, which stopped his assault.

[11]

100.   Additional worker began to arrive and assist JOSE GONZALEZ in sabotaging my production.

101.   Next, on June 10, 2021 at State College Blvd and Lincoln Ave in Anaheim, CA agent ROBERT CRUZ worked the same location.

102.   He immediately tried to attack me and told me to leave but I started recording him and he started joking to the camera.

103.   When he believed the recording had ended, he made a threatening and revealing gesture at me.

104.   Essentially, I was harassed and threatened so frequently that it became impossible for me to perform my duties and forced me to work in remote unknown locations.

105.   On March 25, 2021 my manager RUDY OCHOA turned in the video of Lucia Catalan and Raven MCBRIDE selling fraudulent phones to CREDICO USA, LLC by giving it to agent MATTHEW J. KELLY.

106.   On March 29, 2021 MATTHEW J. KELLY held a zoom meeting for the entire Assurance wireless campaign which included about a dozen separate offices and business under his control.

107.   Then, MATTHEW J. KELLY discouraged us from fraud and told us they were fired immediately.

108.   However, in this zoom MATTHEW J. KELLY stated that he believed the bag was numbered as if to manage the issuance of multiple fraudulent phones and in this case 6 different acts of fraud.

109.   No effort was made to speak with me about the issue.

110.   In May of 2021 I began transitioning into a Director and I was assisted by my owner in forming my business NETWORTH MARKETING, INC.

111.   Also, in May JOSE CORRAL called MATTHEW J. KELLY to get his authorization to remove me from my market.

112.   Next, on June 9, 2021 MATTHEW J. KELLY called a zoom that was based on how to promote directors properly.

113.   The call stated among other things that a person might have to give up the market they want and I took this as a direct response to my promotion and JOSE CORRAL calling to get me reassigned.

114.   Because MICHAEL J. FLYNT and his enterprise of agents and businesses makes MATTHEW J. KELLY significant amounts of money it was decided that I would be transferred to a retail campaign and the Orange County would be officially given to the enterprise of MELA GROUP, INC. AND ANDES CC GROUP, INC.

[12]

115.  This was done with a clear disregard for the fact that this enterprise was indisputably operating a marketing and fraud scheme.

116.  On June 15, 2021 I was given a position on the retail campaign launch and the trajectory of my career was changed at the direction of MATTHEW J. KELLY and he stated that the enterprise was too big and productive to disrupt.

117.  I was given a space in the retail space but being pressed to the point of exhaustion from the Orange County enterprise I departed with my company.

118.  After departing from the CREDICO USA, LLC umbrella I contracted with several other carriers with my business NETWORTH MARKETING, INC.

119.  Despite the fact that I didn't work for the CREDICO USA, LLC umbrella agents from the Orange County enterprise still would demand my locations under threats of violence and I chose to work random and secluded locations to avoid them.

120.  Also, BRUNO SKRZECZKOWSKI was given control of the Orange County market by JOSE CORRAL and took over the location under the business name A GAME CONSULTING, INC.

121.  I became exhausted and burned out with my marketing business because of the traumatic journey in the Orange County market and to ensure my safety from MICHAEL J. FLYNT and his entourage I moved out of the state of California to Kansas.

122. My incorporation documents were sent, addressed to GERALD BAROS, to ENCOMPASS CORE, INC. and they held them without the intent to return or deliver them.

123. Later in 2021 I contacted MELISSA BANUELOS, the person that helped me incorporate my business, and asked for all my materials relating to the company.

124. After she contacted ENCOMPASS CORE, INC. they eventually sent the corporation folder, content s, and mail.


V.    CLAIMS FOR RELIEF

CLAIM 1: Civil RICO – 18 U.S.C. § 1962(c) and (d) and Intentional Interference with Contractual Relations


[13]

1.    **Defendants' Conduct: Defendants have violated 18 U.S.C. § 1962(c) and (d) by directing or participating in an enterprise involved in a pattern of racketeering activity. This includes extortion, robbery, fraud, and serious threats of violence as part of their ongoing criminal enterprise.**

2.    **Racketeering Activity:**

•    **Extortion: Defendants repeatedly demanded control over Plaintiff's kiosk locations, using threats of violence to intimidate and coerce Plaintiff into compliance. These threats were frequent and escalated, creating a climate of fear and coercion.**

•    **Robbery: Plaintiff was assaulted on two occasions by members of the Defendant group and was forced to leave without their property, which meets the definition of robbery under 18 U.S.C. § 1951. These incidents were part of a broader strategy of harassment, intimidation, and theft to control Plaintiff's business.**

•    **Fraud (Identity Document Fraud): Defendants engaged in a fraudulent scheme involving identity documents to acquire fraudulent phones and services. By using stolen or falsified identities, they obtained multiple phones with active service plans, which they then resold at a profit. This fraud was designed to allow Defendants to unfairly dominate the market, displacing legitimate competition and obtaining a disproportionate market share. The fraudulent phones created a facade of success, further solidifying their market control and undermining real competition.**

•    **Threats of Violence: Plaintiff endured repeated and consistent threats of violence, many of which were perceived as fatal threats. These threats were not isolated incidents but part of an overall pattern of intimidation designed to subdue Plaintiff and other competitors, contributing to the Defendants' overall racketeering enterprise.**

3.    **Pattern of Racketeering Activity: Defendants' activities constitute a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5). The multiple acts of extortion, robbery, fraud, and threats of violence show a continued, sustained, and related course of conduct, carried out over a period of time. The fraud involving identity documents and phones allowed Defendants to control the marketplace, gain an unfair market advantage, and stifle legitimate competition, all part of their broader goal to dominate the industry.**

4.    **Enterprise: Defendants' actions were carried out through an associated-in-fact enterprise, consisting of multiple individuals and entities working together to further their criminal activities. This enterprise was not limited to**

[14]

one individual act of racketeering but was a complex, ongoing conspiracy to fraudulently control the market, intimidate competitors, and profit from illegal activities. The enterprise engaged in extortion, robbery, fraud, and threats of violence, with each participant contributing to the scheme and benefiting from its success.

5.      **Injury to Plaintiff's Business and Property: Plaintiff has suffered severe financial harm due to Defendants' racketeering activities. Plaintiff lost control over their kiosk locations and was subjected to assault, robbery, and threats. Additionally, Defendants' fraudulent activities, including the acquisition of phones through identity fraud, gave them an unfair advantage in the marketplace, undermining Plaintiff's legitimate business and causing significant damage to Plaintiff's operations and profitability. The business or property right violated is as follows:**

**Intentional Interference with Contractual Relations**

6.      **Existence of a Contract: Plaintiff had valid, enforceable contracts with ENCOMPASS CORE, INC., CREDICO USA, LLC, and Assurance Wireless. Additionally, Plaintiff had an unwritten contract with ENCOMPASS CORE, INC. AND CREDICO USA, LLC regarding a management training program. The contract with ENCOMPASS CORE involved marketing for new customers for Assurance Wireless. And providing services related to those phones. The unwritten contract with CREDICO USA, LLC and ENCOMPASS CORE, INC. was based on mutual understandings surrounding management training for business operations.**

7.      **Knowledge of the Contract: Defendants, including CREDICO USA, LLC, MATTHEW J. KELLY, MELA GROUP, INC., MICHAEL J. FLYNT, LLC, MICHAEL J. FLYNT, ANDES CC GROUP, INC., JOSE CORRAL, A GAME CONSULTING, INC., and BRUNO SKRZECZKOWSKI knew or should have known of Plaintiff's contractual relationships with these third parties. Defendants' actions demonstrate an awareness of Plaintiff's reliance on these contracts for conducting business and their strategic importance to Plaintiff's operations.**

8.      **Defendants' Conduct Preventing Performance: Defendants' actions directly interfered with Plaintiff's ability to perform under these contracts. Through threats, extortion, and fraudulent activities, Defendants obstructed Plaintiff's ability to continue fulfilling their contractual obligations. This conduct, including the use of violence and intimidation, made it impossible for Plaintiff to maintain business relationships and perform contractual duties effectively, leading to increased costs and loss of opportunities.**

[15]

9.    **Intent to Disrupt Performance or Knowledge of Certain Disruption:** Defendants intentionally disrupted Plaintiff's current and prospective contractual relationships. Through acts of extortion, fraud, and threats of violence, Defendants acted with the knowledge that such actions would or were substantially certain to disrupt Plaintiff's business and hinder performance of these contracts.

10.    **Harm to Plaintiff:** As a result of Defendants' interference, Plaintiff suffered significant harm, including the loss of contracts with ENCOMPASS CORE, INC., CREDICO USA, LLC and ASSURANCE WIRELESS. The failure to perform on these contracts caused financial harm, loss of business opportunities, and profit damage. The disruptions also resulted in lost revenue and prevented Plaintiff from fulfilling business obligations.

11.    **Substantial Factor in Causing Harm:** Defendants' conduct was a substantial factor in causing Plaintiff's harm. The interference with Plaintiff's contracts directly contributed to the failure of those agreements, causing financial damage, loss of business relationships, and business profits.

12.    **Conspiracy to Violate RICO (18 U.S.C. § 1962(d)):** Defendants conspired to violate RICO by agreeing to participate in the enterprise described above. Each Defendant knowingly participated in the conspiracy and took steps to further the racketeering activities, whether through extortion, fraud, threats, or robbery. Even if some Defendants did not directly participate in each act of racketeering, they are liable for the conspiracy under 18 U.S.C. § 1962(d) as they intentionally coordinated and facilitated the illegal activities.

13.    **Damages:** As a direct result of Defendants' racketeering activities and their intentional interference with Plaintiff's contractual relations, Plaintiff seeks to recover damages for the loss of business and property. Plaintiff was entitled to the full revenue of the Orange County market, operating at 10 locations, each generating $200 per day. Over the course of a 3-year contract, this market would have generated approximately $2,190,000 in total revenue, which represents the economic benefit Plaintiff was deprived of. Given the egregious nature of the racketeering and interference, Plaintiff requests treble damages pursuant to 18 U.S.C. § 1964(c), resulting in a total of $6,570,000 in damages, as well as attorneys' fees, costs, and other remedies as allowed by law.

**CLAIM 2: Civil RICO – 18 U.S.C. § 1962(c) and (d) and Intentional Interference with current and Prospective Economic Relations**

[16]

1. **Defendants' Conduct:** Defendants have engaged in conduct constituting violations of 18 U.S.C. § 1962(c) and (d) by directing or participating in an enterprise involved in a pattern of racketeering activity. Specifically, Defendants have utilized extortion, robbery, fraud, and serious threats of violence as part of their ongoing criminal enterprise.

2. **Racketeering Activity:**

• **Extortion:** Defendants repeatedly demanded control over Plaintiff's kiosk locations, using threats of violence to intimidate and coerce Plaintiff into complying with their demands. These threats were frequent and escalated in severity, creating a climate of fear and coercion.

• **Robbery:** Plaintiff was assaulted on two occasions by members of the Defendant group and was forced to leave without their property, which meets the definition of robbery under 18 U.S.C. § 1951. These incidents were part of a broader strategy of harassment, intimidation, and theft to control Plaintiff's business.

• **Fraud (Identity Document Fraud):** Defendants engaged in a fraudulent scheme involving identity documents to acquire fraudulent phones and services. By using stolen or falsified identities, they were able to obtain multiple phones with active service plans, which they then resold at a profit. This fraud was designed to allow the Defendants to unfairly dominate the market, displacing legitimate competition and obtaining a disproportionate market share. The fraudulent phones allowed Defendants to create a facade of success, further solidifying their market control and undermining real competition.

• **Threats of Violence:** Plaintiff endured repeated and consistent threats of violence, many of which were perceived as fatal threats. These threats were not isolated incidents but formed part of the overall pattern of intimidation designed to subdue Plaintiff and other competitors, thereby contributing to the Defendants' overall racketeering enterprise.

3. **Pattern of Racketeering Activity:** The Defendants' activities constitute a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5). The multiple acts of extortion, robbery, fraud, and threats of violence show a continued, sustained, and related course of conduct, carried out over a period of time. The fraud involving identity documents and phones allowed Defendants to control the marketplace, gain an unfair market advantage, and stifle legitimate competition, all of which were part of their broader goal to dominate the industry.

[17]

4.      Enterprise: The Defendants' actions were carried out through an associated-in-fact enterprise, consisting of multiple individuals and entities working together to further their criminal activities. This enterprise was not limited to one individual act of racketeering but was a complex, ongoing conspiracy to fraudulently control the market, intimidate competitors, and profit from illegal activities. The enterprise engaged in extortion, robbery, fraud, and threats of violence, with each participant contributing to the scheme and benefiting from its success.

5.      Injury to Plaintiff's Business and Property: Plaintiff has suffered severe financial harm as a result of Defendants' racketeering activities. Plaintiff lost control over their kiosk locations and was subject to assault, robbery, and threats. Additionally, Defendants' fraudulent activities, including the acquisition of phones through identity fraud, gave them an unfair advantage in the marketplace, undermining Plaintiff's legitimate business and causing significant damage to Plaintiff's operations and profitability. The business or property right violated is as follows;

6.      Intentional Interference with Prospective Economic Relations

1.      Existence of an Economic Relationship: Plaintiff had prospective economic relationships with the following entities and individuals:

•       Encompass Core, Inc. and Credico USA, LLC: Plaintiff was positioned to benefit economically by freely operating within Orange County through a management training program and kiosk operations. These opportunities were expected to result in substantial revenue growth and business development for Plaintiff.

•       Clientele Base: Plaintiff's nurtured business model at kiosk locations consistently provided at least five phones daily to the public, generating steady revenue. With over 20 kiosk locations, the anticipated economic benefit was significant.

2.      Defendants' Knowledge of the Economic Relationships: Defendants, including but not limited to Encompass Core, Inc., Credico USA, LLC, and individuals like Matthew J. Kelly, were aware of Plaintiff's relationships and the potential economic benefits they offered. Defendants were also aware of the importance of Plaintiff's client base to their overall business success.

3.      Defendants' Wrongful Conduct: Defendants engaged in wrongful conduct that interfered with these prospective economic relationships, including:

[18]

- **Racketeering Activities:** Threats of violence, extortion, and fraud to seize control of Plaintiff's kiosk locations, disrupt operations, and undermine Plaintiff's business.
- **Fraudulent Schemes:** Using fraudulent identity documents to acquire phones and services fraudulently, allowing Defendants to overshadow legitimate production and secure a disproportionate market share.
- **Neglect of Evidence:** Matthew J. Kelly disregarded clear evidence of fraudulent activities and instead relied on fraudulent gains to justify Defendants' business practices and positions.

4.    **Intent to Disrupt or Knowledge of Substantial Disruption:** Defendants intentionally sought to disrupt Plaintiff's economic relationships, knowing that their wrongful conduct was certain or substantially certain to cause harm to Plaintiff's relationships with Encompass Core, Credico, and Plaintiff's clientele.

5.    **Disruption of Relationships:** Defendants' actions directly disrupted these relationships by undermining Plaintiff's credibility, obstructing access to kiosk operations, and eroding trust with clientele. Plaintiff was prevented from fully realizing the economic benefits of these relationships.

6.    **Harm to Plaintiff:** As a result of Defendants' interference, Plaintiff suffered substantial harm, including:

- **Loss of prospective revenue from kiosk operations, estimated at five phones per day across over 20 kiosks.**
- **Diminished opportunities for growth through partnerships with Encompass Core and Credico.**
- **Reputational damage and loss of goodwill within the market and clientele base.**

7.    **Substantial Factor in Causing Harm:** Defendants' wrongful conduct was a substantial factor in the disruption of Plaintiff's economic relationships, leading to financial losses, operational setbacks, and profit harm.

8.    **Conspiracy to Violate RICO (18 U.S.C. § 1962(d)):** Defendants conspired to violate RICO by agreeing to participate in the enterprise described above. Each Defendant knowingly participated in the conspiracy and took steps to further the racketeering activities, whether through extortion, fraud, threats, or robbery. Even if some Defendants did not directly participate in each act of racketeering, they are liable for the conspiracy under 18 U.S.C. § 1962(d) as they intentionally coordinated and facilitated the illegal activities.

[19]

9.      **Damages:** Plaintiff's business operations in the Orange County market, including its development of 10 kiosk locations, were severely disrupted by Defendants' racketeering activities and intentional interference with current and prospective economic relations. Over the anticipated 3-year term of the contract, Plaintiff's market operations would have generated $2,190,000 in revenue. Given the substantial interference and loss of potential revenue caused by Defendants, Plaintiff seeks to recover treble damages under 18 U.S.C. § 1964(c), totaling $6,570,000, which includes compensation for lost economic opportunities and the damage to Plaintiff's ability to operate the market without racketeering interference. Plaintiff also seeks recovery of attorneys' fees and other legal costs.

**CLAIM 3: CIVIL RICO – 18 U.S.C. § 1964 (c) and (d) and Negligent Interference with Current and Prospective Economic Relations**

1.      **Defendants' Conduct:** Defendants have engaged in conduct constituting violations of 18 U.S.C. § 1962(c) and (d) by directing or participating in an enterprise involved in a pattern of racketeering activity. Specifically, Defendants have utilized extortion, robbery, fraud, and serious threats of violence as part of their ongoing criminal enterprise.

2.      **Racketeering Activity:**

•       **Extortion:** Defendants repeatedly demanded control over Plaintiff's kiosk locations, using threats of violence to intimidate and coerce Plaintiff into complying with their demands. These threats were frequent and escalated in severity, creating a climate of fear and coercion.

•       **Robbery:** Plaintiff was assaulted on two occasions by members of the Defendant group and was forced to leave without their property, which meets the definition of robbery under 18 U.S.C. § 1951. These incidents were part of a broader strategy of harassment, intimidation, and theft to control Plaintiff's business.

•       **Fraud (Identity Document Fraud):** Defendants engaged in a fraudulent scheme involving identity documents to acquire fraudulent phones and services. By using stolen or falsified identities, they were able to obtain multiple phones with active service plans, which they then resold at a profit. This fraud was designed to allow the Defendants to unfairly dominate the market, displacing legitimate competition and obtaining a disproportionate market share. The fraudulent phones allowed Defendants to create a facade of success, further solidifying their market control and undermining real competition.

[20]

- **Threats of Violence: Plaintiff endured repeated and consistent threats of violence, many of which were perceived as fatal threats. These threats were not isolated incidents but formed part of the overall pattern of intimidation designed to subdue Plaintiff and other competitors, thereby contributing to the Defendants' overall racketeering enterprise.**

**3.     Pattern of Racketeering Activity: The Defendants' activities constitute a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5). The multiple acts of extortion, robbery, fraud, and threats of violence show a continued, sustained, and related course of conduct, carried out over a period of time. The fraud involving identity documents and phones allowed Defendants to control the marketplace, gain an unfair market advantage, and stifle legitimate competition, all of which were part of their broader goal to dominate the industry.**

**4.     Enterprise: The Defendants' actions were carried out through an associated-in-fact enterprise, consisting of multiple individuals and entities working together to further their criminal activities. This enterprise was not limited to one individual act of racketeering but was a complex, ongoing conspiracy to fraudulently control the market, intimidate competitors, and profit from illegal activities. The enterprise engaged in extortion, robbery, fraud, and threats of violence, with each participant contributing to the scheme and benefiting from its success.**

**5.     Injury to Plaintiff's Business and Property: Plaintiff has suffered severe financial harm as a result of Defendants' racketeering activities. Plaintiff lost control over their kiosk locations and was subject to assault, robbery, and threats. Additionally, Defendants' fraudulent activities, including the acquisition of phones through identity fraud, gave them an unfair advantage in the marketplace, undermining Plaintiff's legitimate business and causing significant damage to Plaintiff's operations and profitability. The business or property right violated is as follows;**

**Fourth Cause of Action: Negligent Interference with Prospective Economic Relations**

**6.     Existence of an Economic Relationship:**

**Plaintiff had prospective economic relationships that likely would have resulted in substantial future economic benefits, including:**

- **Encompass Core, Inc. and Credico USA, LLC: Plaintiff was positioned to benefit economically from partnerships and opportunities to operate freely in Orange County through a management training program and kiosk operations.**

[21]

- **Clientele Base:** Plaintiff's cultivated kiosk business model consistently served at least five customers per day at over 20 kiosk locations, creating substantial anticipated revenue.

7. **Defendants' Knowledge or Constructive Knowledge of the Relationship:** Defendants knew or should have known of Plaintiff's economic relationships, including the contracts and arrangements with Encompass Core, Credico, and Plaintiff's established clientele. These relationships were vital to Plaintiff's business operations and success.

8. **Foreseeability of Disruption:** Defendants knew or should have known that their failure to act with reasonable care would disrupt Plaintiff's economic relationships. Their reckless and careless actions created foreseeable risks of harm to Plaintiff's business.

9. **Failure to Act with Reasonable Care:** Defendants failed to exercise reasonable care by engaging in and allowing wrongful conduct that undermined Plaintiff's business operations. This failure included:

- **Fraudulent Activities:** Allowing or facilitating fraud involving identity documents, resulting in the acquisition of fraudulent phones and services. This fraud created an artificial and unfair market advantage for Defendants, harming Plaintiff's competitive position.

- **Failure to Address Evidence of Fraud:** Defendants, including Matthew J. Kelly, neglected or dismissed clear evidence of fraudulent schemes, exacerbating the disruption to Plaintiff's business.

- **Racketeering Conduct:** Threats, extortion, and acts of violence disrupted Plaintiff's operations and ability to maintain relationships with partners and clients.

10. **Engagement in Wrongful Conduct:** Defendants' actions constituted wrongful conduct, including fraud, misrepresentation, and violations of business ethics. These acts collectively harmed Plaintiff's relationships and disrupted their ability to operate effectively.

11. **Disruption of Economic Relationships:** Defendants' negligent conduct disrupted Plaintiff's relationships with Encompass Core, Credico, and Plaintiff's clientele, preventing the realization of expected economic benefits. This disruption caused operational instability and significant financial losses.

[22]

**12.     Harm to Plaintiff:**

As a result of Defendants' negligent interference, Plaintiff suffered:

- **Lost revenue from disrupted kiosk operations and clientele relationships.**
- **Diminished business opportunities with Encompass Core and Credico.**
- **Reputational harm, market disadvantages, and erosion of goodwill.**

**13.     Substantial Factor in Causing Harm:**

Defendants' wrongful conduct and negligence were substantial factors in disrupting Plaintiff's economic relationships and causing harm. The fraud, racketeering, and disregard for evidence collectively amplified the damages to Plaintiff's business.

**14.     Conspiracy to Violate RICO (18 U.S.C. § 1962(d)): Defendants conspired to violate RICO by agreeing to participate in the enterprise described above. Each Defendant knowingly participated in the conspiracy and took steps to further the racketeering activities, whether through extortion, fraud, threats, or robbery. Even if some Defendants did not directly participate in each act of racketeering, they are liable for the conspiracy under 18 U.S.C. § 1962(d) as they intentionally coordinated and facilitated the illegal activities.**

**15.     Damages: Defendants' negligent interference with Plaintiff's current and prospective economic relations has caused significant harm to Plaintiff's business operations in the Orange County market. Plaintiff's market operations at 10 kiosk locations would have generated $2,190,000 in revenue over 3 years but for Defendants' actions. As a result of Defendants' wrongful conduct, Plaintiff has been deprived of this revenue and is entitled to recover damages for both actual losses and lost future economic benefits. Pursuant to 18 U.S.C. § 1964(c), Plaintiff seeks treble damages, bringing the total damages claim to $6,570,000, in addition to attorneys' fees, costs, and any further relief as permitted by law.**

**CLAIM 4: CIVIL RICO – 18 U.S.C. § 1964 (c) and (d) and Conversion**

**1     Defendants' Conduct: Defendants have engaged in conduct constituting violations of 18 U.S.C. § 1962(c) and (d) by directing or participating in an enterprise involved in a pattern of racketeering activity. Specifically, Defendants have utilized extortion, robbery, fraud, and serious threats of violence as part of their ongoing criminal enterprise.**

**2     Racketeering Activity:**

[23]

- **Extortion: Defendants repeatedly demanded control over Plaintiff's kiosk locations, using threats of violence to intimidate and coerce Plaintiff into complying with their demands. These threats were frequent and escalated in severity, creating a climate of fear and coercion.**
- **Robbery: Plaintiff was assaulted on two occasions by members of the Defendant group and was forced to leave without their property, which meets the definition of robbery under 18 U.S.C. § 1951. These incidents were part of a broader strategy of harassment, intimidation, and theft to control Plaintiff's business.**
- **Fraud (Identity Document Fraud): Defendants engaged in a fraudulent scheme involving identity documents to acquire fraudulent phones and services. By using stolen or falsified identities, they were able to obtain multiple phones with active service plans, which they then resold at a profit. This fraud was designed to allow the Defendants to unfairly dominate the market, displacing legitimate competition and obtaining a disproportionate market share. The fraudulent phones allowed Defendants to create a facade of success, further solidifying their market control and undermining real competition.**
- **Threats of Violence: Plaintiff endured repeated and consistent threats of violence, many of which were perceived as fatal threats. These threats were not isolated incidents but formed part of the overall pattern of intimidation designed to subdue Plaintiff and other competitors, thereby contributing to the Defendants' overall racketeering enterprise.**

**3    Pattern of Racketeering Activity: The Defendants' activities constitute a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5). The multiple acts of extortion, robbery, fraud, and threats of violence show a continued, sustained, and related course of conduct, carried out over a period of time. The fraud involving identity documents and phones allowed Defendants to control the marketplace, gain an unfair market advantage, and stifle legitimate competition, all of which were part of their broader goal to dominate the industry.**

**4    Enterprise: The Defendants' actions were carried out through an associated-in-fact enterprise, consisting of multiple individuals and entities working together to further their criminal activities. This enterprise was not limited to one individual act of racketeering but was a complex, ongoing conspiracy to fraudulently control the market, intimidate competitors, and profit from illegal activities. The enterprise engaged in extortion, robbery,**

[24]

fraud, and threats of violence, with each participant contributing to the
scheme and benefiting from its success.

5       Injury to Plaintiff's Business and Property: Plaintiff has suffered severe
financial harm as a result of Defendants' racketeering activities. Plaintiff lost
control over their kiosk locations and was subject to assault, robbery, and
threats. Additionally, Defendants' fraudulent activities, including the
acquisition of phones through identity fraud, gave them an unfair advantage
in the marketplace, undermining Plaintiff's legitimate business and causing
significant damage to Plaintiff's operations and profitability. The business or
property right violated is as follows;

6. Ownership or Right to Possess Personal Property:

Plaintiff possessed a rightful interest in their business operations, including
kiosk locations and associated assets used to distribute phones. These kiosks
were meticulously cultivated by Plaintiff to serve the public, generating
significant daily revenue and fostering goodwill within the community.

7.   Defendants' Substantial Interference with Plaintiff's Property:

Defendants knowingly and intentionally interfered with Plaintiff's property
by:

•       Seizing Kiosk Locations: Through threats of violence, extortion, and
coercion, Defendants effectively took control of Plaintiff's 20 kiosk locations,
converting them into their own personal operations. This included using
Plaintiff's cultivated locations to serve their fraudulent schemes and
consolidate their market position.

•       Preventing Plaintiff's Access: By instigating threats and physical
altercations, Defendants prevented Plaintiff from accessing or reclaiming
their rightful business locations and associated assets. These acts rendered
Plaintiff unable to continue operations at their kiosks.

•       Misappropriating Business Assets: Defendants fraudulently exploited
Plaintiff's established client base, reputation, and market goodwill to serve
their own interests, including the sale of fraudulently acquired phones and
services.

•       Destroying Business Value: Defendants' acts of violence and fraud
dismantled the value and functionality of Plaintiff's kiosks, rendering them
incapable of fulfilling their intended business purpose.

8. Lack of Plaintiff's Consent:

Plaintiff did not consent to Defendants' takeover or interference with their
property. Defendants' actions were undertaken without Plaintiff's
authorization and against Plaintiff's will.

[25]

**9. Harm to Plaintiff:**

As a result of Defendants' conversion, Plaintiff suffered significant harm, including:

• **Loss of Revenue: Plaintiff lost substantial daily income from each kiosk, estimated to be at least five phones per day across over 20 locations.**

• **Erosion of Market Position: Plaintiff's established kiosk network was converted into Defendants' operations, damaging Plaintiff's competitive standing and ability to recover lost market share.**

• **Reputational Damage: Defendants' wrongful conduct undermined Plaintiff's reputation within the market and community, further compounding the harm to Plaintiff's business.**

• **Loss of Assets and Business Value: The value of Plaintiff's kiosks and the economic relationships they supported was destroyed due to Defendants' actions.**

**10. Substantial Factor in Causing Harm:**

Defendants' wrongful acts were a substantial factor in causing Plaintiff's harm. By knowingly and intentionally converting Plaintiff's property into their own operations, Defendants deprived Plaintiff of the ability to operate their business, generate income, and maintain valuable economic relationships.

**18.    Conspiracy to Violate RICO (18 U.S.C. § 1962(d)): Defendants conspired to violate RICO by agreeing to participate in the enterprise described above. Each Defendant knowingly participated in the conspiracy and took steps to further the racketeering activities, whether through extortion, fraud, threats, or robbery. Even if some Defendants did not directly participate in each act of racketeering, they are liable for the conspiracy under 18 U.S.C. § 1962(d) as they intentionally coordinated and facilitated the illegal activities.**

**19.    Damages: As a direct consequence of Defendants' racketeering and conversion of Plaintiff's business assets, including the conversion of kiosk locations and market territory in Orange County, Plaintiff seeks to recover the value of the property that was wrongfully taken. Plaintiff was entitled to the full operation and control of the Orange County market, which would have generated $2,190,000 in revenue over a 3-year period from 10 locations. Defendants' interference and conversion of Plaintiff's business assets has caused significant financial harm. Plaintiff requests treble damages as**

[26]

provided by 18 U.S.C. § 1964(c), resulting in a total damages award of
$6,570,000, as well as attorneys' fees, costs, and other equitable relief.
**Claim 5: California Unfair Competition – Business and Professional Code §
17200**

**Competition Law (Business and Professions Code § 17200)**
1.      **Legal Framework:**
California's Unfair Competition Law (UCL) prohibits any unlawful, unfair,
or fraudulent business act or practice. A claim under the UCL may be based
on one or more of these prongs:
•       **Unlawful: Practices that violate other laws.**
•       **Unfair: Practices that are unethical, oppressive, or substantially
injurious to consumers or competitors.**
•       **Fraudulent: Practices likely to deceive members of the public.**
2.      **Plaintiff's Allegations Under the UCL:**
Plaintiff alleges that Defendants engaged in a pattern of conduct that
constitutes violations under all three prongs of the UCL:
a. Unlawful Practices:
•       **Extortion and Threats of Violence: Defendants engaged in unlawful
conduct by threatening Plaintiff with physical harm to coerce the
relinquishment of valuable kiosk locations. These acts constitute violations of
criminal statutes prohibiting extortion under California Penal Code § 518.**
•       **Fraud: Defendants engaged in fraudulent activity by exploiting false
identity documents to acquire fraudulent phones and services, selling them to
unfairly dominate the market and gain disproportionate market share. These
acts violate federal and state laws regarding fraud and identity theft, as well
as laws prohibiting deceptive business practices.**
•       **Robbery and Assault: Defendants physically assaulted Plaintiff, forcing
Plaintiff to abandon kiosk locations and personal property. These actions
violate California Penal Code § 211 (robbery) and § 240 (assault).**
b. Unfair Practices:
•       **Market Domination Through Fraudulent Means: Defendants' use of
fraudulent identity documents and production data to overshadow legitimate
businesses, including Plaintiff's, is unethical and oppressive. This conduct
harmed Plaintiff by distorting market competition and depriving Plaintiff of
the ability to fairly compete.**

[27]

- **Misappropriation of Plaintiff's Business Assets:** Defendants unfairly converted Plaintiff's cultivated kiosk network and associated goodwill into their own operations, undermining Plaintiff's business and economic opportunities.
- **Harm to Consumers:** Defendants' practices injured consumers by flooding the market with fraudulently obtained products and services, undermining trust and reliability in the industry.

c. Fraudulent Practices:

- **Deceptive Conduct Toward Business Partners:** Defendants misrepresented their business practices to key stakeholders, including Plaintiff's business partners, to justify their fraudulent market dominance.
- **Consumer Deception:** Defendants' distribution of fraudulently acquired phones and services created the false impression of legitimate business operations, misleading both consumers and competitors.

3.     **Harm to Plaintiff:**

- Plaintiff suffered substantial economic harm, including the loss of kiosk locations, diminished market share, and reputational damage.
- Plaintiff lost opportunities to maintain and grow their business operations due to Defendants' actions, which disrupted key economic relationships and undermined Plaintiff's ability to compete.

4.     **Public Interest:**

Defendants' conduct is detrimental to the public interest as it encourages illegal and unethical business practices, distorts market competition, and harms consumers who rely on the integrity of legitimate business operations.

5.     **Relief Sought:**

Under the UCL, Plaintiff seeks:

1.     Defendants' actions, including the unlawful conversion of Plaintiff's business locations, interference with Plaintiff's contractual and economic relationships, and fraudulent conduct, violate California's Unfair Competition Law (UCL), codified under Business and Professions Code Section 17200. Through these unlawful practices, Defendants have unfairly gained an advantage at Plaintiff's expense, resulting in significant financial harm. As a result of Defendants' actions, Plaintiff was deprived of the economic opportunity to operate its Orange County market, which would have generated approximately $2,190,000 in revenue over a 3-year period from 10 locations. Plaintiff seeks restitution for the money and property Defendants wrongfully obtained, specifically the business value and revenue that was lost

[28]

due to Defendants' illegal actions. In addition to restitution, Plaintiff seeks any other remedies as permitted under Section 17200, including attorneys' fees and costs.

**Claim 6: Declaratory Judgment – Right to Use MTP Materials Without Fear of Infringement**

**(Unclean Hands and Implied Consent)**
**1.    Plaintiff's Business and the MTP Program:**
Plaintiff participated in the Management Training Program (MTP) provided by Defendants, during which Plaintiff was given access to proprietary materials, systems, and intellectual property for the purpose of building and expanding Plaintiff's business operations. These materials, which were integral to the establishment and growth of Plaintiff's business, have been deeply incorporated into the structure and day-to-day operations of Plaintiff's business.
**2.    Defendants' Involvement and Unclean Hands:**
Defendants, knowing that Plaintiff would use these materials and systems to operate Plaintiff's business, intentionally provided them to Plaintiff with full knowledge of Plaintiff's plans and business operations. Defendants' wrongful actions, including fraud, extortion, and racketeering, taint their claim to any intellectual property rights over the materials they provided.
Defendants' misconduct, including manipulation, interference, and racketeering activities aimed at disrupting Plaintiff's business, prevents them from asserting any legitimate claim to intellectual property rights. Their unclean hands render any claim of intellectual property infringement by Defendants inequitable, unjust, and unfair.
**3.    Implied Consent:**
Defendants, through their actions, implicitly consented to Plaintiff's use of the MTP materials and systems. Plaintiff was encouraged to incorporate these materials into their business model as a fundamental part of operating within the MTP framework. By providing these materials and systems with the expectation that Plaintiff would utilize them to operate the business, Defendants gave implied consent for such use, knowing it was essential for Plaintiff's growth and success.
**4.    Request for Declaratory Judgment:**
Plaintiff requests that the Court issue a declaratory judgment affirming Plaintiff's right to use all materials, systems, processes, and intellectual

[29]

property provided during the MTP program without fear of infringing any intellectual property rights of the Defendants. The judgment should be based on the Defendants' unclean hands, the lack of legal ownership over the materials due to their fraudulent and unlawful conduct, and the implied consent that Defendants granted by providing these materials for use in Plaintiff's business operations.

Plaintiff further seeks a ruling confirming that Defendants cannot assert any intellectual property rights over these materials, nor can they bring any infringement or related claims against Plaintiff due to their involvement in the fraudulent activities and their implicit consent to Plaintiff's use of the materials.

5.    **Irreparable Harm:**

Without such a declaratory judgment, Plaintiff's business operations would suffer significant and irreparable harm. Plaintiff's entire business model is rooted in the materials and systems provided during the MTP program, and any disruption of these operations would force Plaintiff to rebuild the business from scratch, resulting in financial loss and damage to the reputation and market share of Plaintiff's business.

6.    **Request for Relief:**

•    A declaratory judgment confirming Plaintiff's right to continue using the MTP materials and systems without fear of infringement claims.

•    A ruling that Defendants' unclean hands and fraudulent actions bar them from asserting any intellectual property rights over the MTP materials.

•    An order confirming that Plaintiff's use of the materials is protected from any future infringement claims or legal actions by Defendants.

•    Any other relief the Court deems necessary to protect Plaintiff's business interests and rights.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1.    **Compensatory Damages:** Award Plaintiff compensatory damages in the amount of $2,190,000, representing the revenue lost due to Defendants' unlawful actions, including their interference with Plaintiff's business operations, contractual relations, and economic opportunities, for a period of three years based on 10 kiosk locations generating an estimated $200 per day.

2.      **Treble Damages**: Pursuant to 18 U.S.C. § 1964(c) and California's Unfair Competition Law, award Plaintiff treble damages on the compensatory damages, amounting to $6,570,000, to reflect the harm caused by Defendants' racketeering activities, unlawful interference, and fraudulent conduct.

3.      **Restitution**: Award Plaintiff restitution in the amount of $2,190,000, to restore the value of the business and market opportunities that were unlawfully converted or lost as a result of Defendants' actions.

4.      **Declaratory judgment** confirming Plaintiff's right to continue using the MTP materials and systems without fear of infringement claims, ruling that Defendants' unclean hands and fraudulent actions bar them from asserting any intellectual property rights over the MTP materials, an order confirming that Plaintiff's use of the materials is protected from any future infringement claims or legal actions by Defendants.

5.      **Attorney's Fees and Costs**: Award Plaintiff the reasonable attorney's fees and litigation costs incurred in prosecuting this action, as provided under 18 U.S.C. § 1964(c), California Business & Professions Code § 17200, and other applicable legal provisions.

6.      **Interest**: Award Plaintiff interest on all damages awarded, both pre- and post-judgment, at the legal rate applicable in this case.

7.      **Other Relief**: Grant such other and further relief as the Court deems just and proper, including any other remedies available under the law.

## VII.   JURY DEMAND

1.      Plaintiff hereby demands a trial by jury on all claims and issues so triable, including but not limited to all claims arising under 18 U.S.C. § 1962, 18 U.S.C. § 1964, California Business and Professions Code § 17200, and any other claims for relief set forth in this Complaint.

**Certification Under Penalty of Perjury:**
I, GERALD BAROS, hereby certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief. Executed on this 5 day at Leavenworth, Kansas.

Dated this 5 day of January, 2025.

[31]

*GERALD BAROS*

**GERALD BAROS, pro se**

**PROOF OF SERVICE (Court Filing)**

I am a resident of or employed in the county where the service occurred. I am over
the age of 18 and not a party to the within action. I served the Complaint and all
accompanying documents on January 10, 2025, by personally delivering the
documents to the Clerk's Office at the **United States District Court for the
Central District of California**, located at 411 West 4th Street, Room 1053 Santa
Ana, CA 92701.

**Case Number:** n/a

**Documents Served:**

- Complaint
- In forma pauperis motion.

**Name of Person Who Served Documents:** Amelia Sierra

**Signature of Person Serving Documents:** X *Amelia Sierra*

I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

Executed on January 10, 2025 at Santa Ana, California.

**Signature:** *GERALD BAROS*

Amelia Sierra

148 N Vicentia Ave, Corona, CA 92882

Phone: (323) 944-6841

[32]

## PROOF OF SERVICE (Court Filing)

I am a resident of or employed in the county where the service occurred. I am over the age of 18 and not a party to the within action. I served the Complaint and all accompanying documents on January 10, 2025, by personally delivering the documents to the Clerk's Office at the United States District Court for the Central District of California, located at 411 West 4th Street, Room 1053 Santa Ana, CA 92701.

Case Number: n/a

Documents Served:

- **Complaint**
- **In forma pauperis motion.**

Name of Person Who Served Documents: Amelia Sierra

Signature of Person Serving Documents: X *Amelia Sierra*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 10, 2025 at Santa Ana, California.

Signature: GERALD BAROS

Amelia Sierra

148 N Vicentia Ave, Corona, CA 92882

Phone: (323) 944-6841